UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12-cv-00038-DBH |
| | ) | |
| RUSSELL CHRETIEN, | ) | |
| | ) | |
| Defendant. | ) | |

### RECOMMENDED DECISION

This litigation relates to the termination of Defendant Russell Chretien's Exclusive Agency Agreement with Plaintiff Allstate Insurance Company. Where once there were five defendants and two interested parties, the case is now limited to the principal parties, Allstate and Chretien. Presently before the Court are cross-motions for summary judgment. Allstate asserts five counts against Chretien in its amended complaint. Of these counts, Chretien's motion (ECF No. 139) challenges two[1]: a claim of unfair competition (count VII) and a claim of tortious interference (count VIII). In his counterclaim, Chretien asserts six counts against Allstate. Allstate's motion (ECF No. 135) challenges five: tortious interference (count II), unfair competition (count III), conversion (count IV), fraud (count V), and whistleblower retaliation (count VI). In addition, Allstate seeks judgment in its favor on its own, second count for breach of contract. The Court referred the motions for report and recommendation. Based on the summary judgment factual record produced by the parties and for reasons that follow, I recommend that the Court grant Chretien's motion and grant, in part, and deny, in part, Allstate's motion.

---

[1] Chretien's motion actually challenges four counts, but Chretien withdrew his challenges to Allstate's count I and count VI.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011).  If the court's review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims.  Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

Cross motions for summary judgment do not alter the Rule 56 standard.  Nor do they require the granting of either motion.  Wiley v. Am. Greetings Corp., 762 F.2d 139, 141 (1st Cir. 1985).  "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).

**FACTS**

The parties have presented the Court with a total of six fact statements filed in accordance with Local Rule 56; one statement, one responsive statement with additional statement, and one reply statement for each motion.  I have attempted to collate the various factual statements found in these filings into one cohesive and, for the most part, logically ordered statement.

*General Background Facts*

Allstate provides insurance products and services to individuals and businesses through a variety of channels.  One involves the appointment of independent exclusive agents through Allstate's Exclusive Agency Program.  (Allstate's Stmt. ¶¶ 1-2, ECF No. 136.)  Allstate screens its exclusive agent candidates to ensure they are qualified to represent and sell Allstate products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate insurance solutions.  (Id. ¶ 3.)

Between 1987 and 2000, Chretien worked for Allstate in a position of Agency Manager of Maine, during which time he worked on a daily basis with Allstate employees and agents in the field.  (Chretien's Add'l Stmt. ¶ 129, ECF No. 147.)  There is a genuine issue whether Chretien's work included administration of Allstate's Exclusive Agency Agreement, its supplement, and related manual.  Chretien attests that it did.  An Allstate employee attests that Chretien worked with independent agencies rather than exclusive agencies.  (Id. ¶ 130; Allstate's Reply Stmt. ¶ 130, ECF No. 162.)  In 2000, Chretien and his wife bought the Whitehouse Agency at 1045 Broadway, Bangor, from Robert Whitehouse for just under one million dollars. (Chretien's Add'l Stmt. ¶ 131.)

Russell Chretien and his Whitehouse Agency became an Allstate exclusive agency on or about February 1, 2006, selling exclusively Allstate insurance products.  (Allstate's Stmt. ¶¶ 16, 19; Chretien's Stmt. ¶¶ 1, 4, ECF No. 140.)  During the time period relevant to this action, Chretien conducted his exclusive agency business with the help of three employees, Sadie Chretien Tyler, Novilla Rollins, and MacKenzie Davis.  (Allstate's Stmt. ¶¶ 20, 21.)  As of December 20, 2011, the Whitehouse Agency's book of business consisted of 2,006 different

households, which amounted to approximately $2.9 million in premiums per year.  (Id. ¶ 20; Chretien's Add'l Stmt. ¶ 132.)

The duties and obligations of an exclusive agent are set forth in Allstate's Exclusive Agent Agreement.  (Allstate's Stmt. ¶ 4; Exclusive Agent Agreement, ECF No. 136-2.)  That Agreement states that an exclusive agent is an independent contractor and not an employee of Allstate.  (Allstate Stmt. ¶ 5.)  The Exclusive Agent Agreement authorizes exclusive agents to hire employees to assist them in the performance of their duties and obligations.  (Id. ¶ 6.)  With respect to the ability of an exclusive agent's employees to access Allstate's "confidential information or trade secrets," the Exclusive Agent Agreement states that the exclusive agent must first have his employees sign Allstate's Confidentiality and Non-Competition Agreement and forward a signed copy to Allstate.  (Id. ¶ 7; Confidentiality and Non-Competition Agreement, ECF No. 136-4.)

Both the Exclusive Agent Agreement and the Confidentiality and Non-Competition Agreement characterize policyholder information as confidential and state that such information is owned by Allstate, may not be disclosed to third parties, and may only be used to assist the exclusive agent in carrying out the provisions of, or performing services under, the Exclusive Agency Agreement.  (Allstate's Stmt. ¶¶ 8-11.)  The covenants not to disclose confidential information survive termination.  (Id. ¶¶ 12-13.)

In addition to non-disclosure, both agreements recite non-competition covenants.  The Exclusive Agency Agreement provides that the exclusive agent will not solicit the purchase of products or services in competition with Allstate from a location within one mile of the agent's prior Allstate sales location.  (Id. ¶ 14; Chretien's Stmt. ¶ 17.)  Additionally, for a period of one year the agent may not solicit purchases from the agent's former Allstate customers or any

existing Allstate customer whose identity the agent discovered as a result of his status as agent or access to confidential Allstate information.  (Allstate's Stmt. ¶ 14.)  As for the agent's employees, the Confidentiality and Non-Competition Agreement states that the employee will not solicit the purchase of products or services in competition with Allstate and it provides for the same one-year period and one-mile territorial restriction.  Like the restriction imposed on the exclusive agent, the non-competition provision for the employees applies, with respect to the one-year limitation, to the agent's former customers who are still Allstate customers and to Allstate customers known to the employee as a result of access to confidential information.[2]  (Id.)

The parties dispute whether Allstate has consistently sought to enforce the non-competition covenant against agency employees.  According to Chretien, the use of non-compete contracts with agency employees was widely regarded in the industry as "a joke," though Allstate disagrees.  (Id. ¶ 15; Chretien's Opposition Stmt. ¶ 15; Chretien's Add'l Stmt. ¶ 210.)

It is undisputed that Chretien's employees (Chretien Tyler, Davis, and Rollins) had access to Allstate's customer lists, premium information, and similar information.  (Allstate's Stmt. ¶ 26.)  One focus of summary judgment is whether Chretien required his employees to sign the Confidentiality and Non-Competition Agreement.  Another is whether it was really necessary for Chretien to obtain signed paper agreements from his employees for Allstate in light of an

---

[2]        The Exclusive Agent Agreement includes the following additional language, which is not included in the non-competition provision of the Confidentiality and Non-Competition Agreement devised for the agent's employees:

> You recognize that each of the foregoing provisions of this Section [relating to obligations upon termination] is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom.  You recognize and acknowledge that the foregoing provisions will not prevent you from earning a livelihood and are not an undue restraint on you.

(Chretien's Opposing Stmt. ¶ 14, ECF No. 147.)

automated system for collecting such agreements from those who access Allstate's confidential electronic systems.

Chretien denies Allstate's statement that he "never had [them] execute" the agreement, saying Allstate "automated the signature function," and citing Allstate's initial litigation position or understanding that these employees had executed the agreement.  (Chretien's Opposition Stmt. ¶¶ 27, 29.)  Of course, Allstate's initial litigation position does not establish that Chretien actually had his employees sign the agreement.  But while Chretien fails to provide evidence that he personally saw to it that his employees executed the Confidentiality and Non-Competition Agreement, Chretien's deposition testimony supports an inference that his employees were approved to access Allstate's confidential electronic systems *by Allstate* without the return of executed paper versions of the agreement.  In Chretien's view, Allstate had already approved the employees and provided them with "binding authority," so that their access to Allstate's systems was obtained with Allstate's approval.  (Chretien Dep. of June 12, 2012, at 96-97, ECF No. 147-1.)

Additionally, Chretien explains that an Allstate representative, Field Sales Representative Matt Gredler, called him on one or more occasions to have this paperwork completed and, according to Chretien's sworn testimony, walked Chretien through the process of completing the paperwork online, including giving Chretien instruction to use the employee's code to sign on to complete the form for them.  Chretien says that this approach appeared to satisfy Gredler.  (Id. at 88-90, 95.)  Indeed, Chretien asserts that Gredler instructed him to proceed in this fashion. (Chretien Aff. ¶ 66, ECF No. 147-2.)  Chretien testified that he did not "sign" for the employees, he just used each employee's identification and code to complete the required electronic

6

paperwork.  (Chretien Dep. at 101.)  Chretien admits that he did not have permission to execute

the agreements for his employees or authority to bind them.  (Id. at 102;  Allstate's Stmt. ¶ 32.)

Finally, Chretien states that his understanding is that his employees could not have

accessed Allstate's databases without first electronically executing the Confidentiality and Non-

Competition Agreement.  (Chretien Aff. ¶ 9.)  Exhibits suggest that Allstate's automated systems

do coordinate this process and do not require the exclusive agent to return a formal, signed paper

copy of each employee's Confidentiality and Non-Competition Agreement to Allstate.  (See ECF

Nos. 154-1 (sealed), 154-5.)

*The "Deluxe Plus" controversy and changes to the agency agreement*

The Exclusive Agency Agreement states:  "[Allstate] will determine in its sole discretion

all matters relating to its business and the operation of [Allstate], including, but not limited to,

. . . [t]he limitation, restriction or discontinuance of the writing or selling of any policies,

coverages, lines, or kinds of insurance or other [Allstate] business."  (Allstate's Stmt. ¶ 119.)

In January or February 2011, Allstate elected to cancel an insurance product known as

the Deluxe Plus policy.  Allstate's discontinuation of the product was imposed on a national

basis.  (Id. ¶¶ 120-122.)  Allstate decided to transition to the ISO rating system, including the

ISO rating system for fire risk.  (Allstate's Reply Stmt. ¶ 134.)  However, Allstate's

methodology for canceling the Deluxe Plus policies came under scrutiny.  As Chretien describes

it, a "purge" of Deluxe Plus policies occurred because the policies had been issued before the

advent of computer databases that tracked such things as a property's distance to the nearest fire

station.  (Chretien's Add'l Stmt. ¶¶ 134, 137.)  Because the data was unavailable for many long-

insured properties, these properties were automatically classified as "Class 10" in the ISO

system, meaning without fire protection, and cancelled on that basis or subjected to substantial

increases in premiums, even though the classification was not actually justified for many properties.  (Id. ¶¶ 135, 138;  Allstate's Reply Stmt. ¶ 138.)

Chretien voiced written and oral concerns over the handling of Deluxe Plus accounts and personally felt that the cancelations were illegal or unethical.  (Chretien's Stmt. ¶¶ 6, 8.)  He informed Allstate "up the chain of command" of his concerns, spoke out that the program was unfair and illegal at an agents' meeting, and asked Allstate to check with its legal department.  (Id. ¶ 9;  Chretien's Add'l Stmt. ¶ 140.)  The Maine Department of Insurance held hearings and supplied relief in June 2011 for some Deluxe Plus customers who appealed the non-renewal or cancelation of their policies, and Allstate ultimately entered into an agreement whereby Allstate would, from that point forward, renew certain policies.  (Allstate's Stmt. ¶ 123.)  Chretien assisted two of his customers with what turned out to be successful appeals to the Maine Department of Insurance, which ordered Allstate to reinstate their Deluxe Plus policies.  (Id. ¶ 124;  Chretien's Add'l Stmt. ¶¶ 139, 142.)  When Chretien asked his regional manager, Matt Gredler, when all affected homeowners would be notified that the program was ended and that their coverage would be reinstated, Gredler, according to Chretien, became angry and stated, "There is not going to be any fucking letter."  (Chretien's Add'l Stmt. ¶ 144.)

Chretien testified at his deposition that he suffered no negative change in his compensation plan following his activity related to the Deluxe Plus cancelations.  (Allstate's Stmt. ¶ 125.)  However, Chretien believes that this activity in early 2011 negatively impacted him later in 2011 when he sought to purchase the books of other agencies[3] and late in 2011 when

---

[3]     Chretien states that he was motivated to purchase additional agencies in 2011 due to certain changes in mid-2011 to Allstate's commissions structure.  (Chretien's Add'l Stmt. ¶ 147.)  These changes were not restricted to his agency alone.  These and additional changes related to Allstate's termination payout plan and financial goals put pressure on Chretien and other agents to expand their customer bases.  (Id. ¶¶ 149, 151.)

he decided to terminate his relationship[4] with Allstate and sought to sell his book of business to another agency.

*Acquiring other books of business*

In order to purchase an economic interest in an Allstate agency's "book of business," Allstate must provide written approval prior to the purchase.  (Id. ¶ 33.)  Allstate's Exclusive Agency Agreement states that Allstate "retains the right in its exclusive judgment to approve or disapprove" any transfer of interest in a book of business.  (Id. ¶¶ 34, 58.)  In the spring of 2011, Chretien sought to purchase one or more other books of business.  (Id. ¶ 36;  Chretien Opposing Stmt. ¶ 36.)  According to Allstate, Chretien was denied these opportunities because his agency was not meeting expectations, although Allstate also maintains that it had an absolute right to reject any acquisition for any reason.  (Allstate's Stmt. ¶ 38;  Allstate's Reply Stmt. ¶ 156.)  According to Chretien, Matt Gredler (varyingly described as either Field Sales Representative or Territorial Sales Leader) visited his agency on September 29, 2011, and told him that he was being denied the opportunity to acquire additional books of business because Allstate was "not happy" with his part in the Deluxe Plus controversy and was therefore denying or blocking his requests.  (Chretien's Add'l Stmt. ¶ 155.)  Chretien perceived that he would not be able to meet his personal business goals in light of Allstate's "hostility" and the other changes underway and decided he needed to seek other opportunities.  (Id. ¶ 157.)

*The terminations and the "TPP"*

On September 30, 2011, Chretien notified Allstate that he was "firing Allstate" and terminating his Exclusive Agency Agreement, effective December 31, 2011.  (Allstate's Stmt. ¶

---

[4]      Chretien asserts that Gredler assured him that he would be approved to acquire some other agencies' books of business if he "went along" with the new financial terms imposed by Allstate.  (Id. ¶ 153.)

42;  Chretien's Stmt. ¶ 2.)  He also indicated to Allstate that he considered himself to be a "whistleblower."  (Chretien's Add'l Stmt. ¶ 159.)

The Exclusive Agency Agreement specifies that terminations include a 90-day period for the agent to sell his or her economic interest in the book of business or elect Allstate's Terminated Payment Plan (TPP).  (Allstate's Stmt. ¶ 43.)  The TPP is paid by Allstate over a 12-month period and is Allstate's estimated economic value of a book of business calculated based on 1.5 times account commissionable premiums.  (Id. ¶ 44.)  Allstate's Exclusive Agent Manual[5] states that an agent's interest in his or her book transfers to Allstate and Allstate pays the agent according to the TPP if the book has not been purchased within the 90-day period.  (Id. ¶ 45.)  A supplement to the Manual adds the following condition on the receipt of payments under the TPP:

> The payment of The Termination Payment will be made in 12 monthly installments, subject to appropriate adjustments, beginning no later than the end of the month after the month in which all property, confidential information, and trade secrets belonging to the Company have been returned or made available for return to the Company.  Payments are subject to compliance with the terms of the confidential and non-competition provisions of the R3001 Agreement, which survive termination of the agreement.

(Id. ¶ 46; PageID # 1461 (emphasis added).)

Chretien faxed Allstate his written termination notice on October 4, 2011, writing on the bottom, "If no buyer materializes before [December 31, 2011], I will require my TPP as stated above."  (Allstate's Stmt. ¶ 49.)  On October 6, 2011, Chretien further informed Allstate that "if for some reason approvals, financing and closing are not completed by November 30, 2011, I will simply take the TPP as originally requested."  (Id. ¶ 50.)  As of November 30, 2011,

---

[5]     The available excerpts of the Manual (ECF No. 138-1) and supplement (ECF No. 138-2) are sealed on the docket.

Chretien did not have a purchaser lined up for his book of business.  (Id. ¶ 54.)  Nor did Chretien

have a purchaser as of December 31, 2011.  (Id. ¶ 55.)

In November 2011, Allstate discovered for the first time that Chretien was employed as a

vice president of United Insurance while simultaneously continuing to run his Allstate-exclusive,

Whitehouse Agency at 1045 Broadway.  (Id. ¶ 51.)  As of December 16, 2011, Allstate had the

plan in place to terminate (as in shutter) Chretien's agency within days.  (Chretien's Add'l Stmt.

¶ 250.)  In a December 20, 2011, email, Allstate's Cathy Arbelo wrote that Chretien was to be

terminated for cause for violation of contractual obligations he owed to Allstate and that "[h]e is

taking the TPP" and his book would be "seeded" to four other area agents effective January 1,

2012.  (Id. ¶ 252;  Allstate's Stmt. ¶¶ 56-57;  Arbelo E-mail re. Termination for Cause, ECF No.

138-4 (sealed);  Arbelo E-mail re. Seeding of Accounts, ECF No. 138-5 (sealed).)  On December

20, Allstate's Territorial Sales Leader Terry Winger arrived at the White House Agency and

terminated the agency effective immediately.[6]  Winger disconnected the phones and computers

at the location.  (Chretien's Add'l Stmt. ¶ 254;  Allstate's Stmt. ¶ 52;  Chretien's Stmt. ¶ 3.)

The Exclusive Agent Manual indicates that an agent terminated for cause still has 90 days

in which to sell his or her book of business.  (Chretien's Add'l Stmt. ¶ 253.)  Winger provided

Chretien with an "effective immediately" termination letter stating that Chretien still had the

ability to sell his economic interest in his book of business and that any approved sale must be

completed by April 1, 2012.  (Id. ¶ 255;  Termination Letter, ECF No. 136-19, PageID # 1406.)

However, Winger also told Chretien that the April date would not be honored, that sale of his

book was no longer an option, and that he would be taking the TPP.  (Chretien's Add'l Stmt. ¶¶

256-258.)

---

[6]     Chretien states that when he gave his own termination notice, he understood that Allstate had the right to
request that he immediately stop working for it.  (Chretien's Add'l Stmt. ¶ 161.)

*Selling Chretien's book*

Allstate offers that it made some efforts to assist Chretien in finding a buyer for his book of business, but denies that it had any obligation to market an agent's book or assist in finding a buyer.  (Allstate's Stmt. ¶¶ 59-61.)  Chretien has not identified any contract term that imposes such a duty on Allstate, but says that Territorial Sales Leader Ted Roberts told him he would look for a buyer if Chretien sent him something saying Chretien wanted Roberts to look.  (Chretien's Add'l Stmt. ¶ 236.)  Chretien responded and, as he characterizes it, "authorized" Roberts to find a buyer and list his agency for sale.  (Id. ¶ 237.)  With respect to listing an agency for sale, Allstate maintains a website for the listing of agencies and books of business.  (Id. ¶ 232.)  Roberts did not list Chretien's agency on Allstate's online listing of agencies for sale, contrary to Roberts's "promise."  (Id. ¶¶ 238-239.)  Chretien did not discover this until December 16, 2011.  (Id. ¶ 239.)  Allstate says that the agent must take the initiative to contact its "home office" to have an agency listed for sale on the site.  (Allstate's Stmt. ¶ 63.)  Chretien admits that Allstate took the same steps to assist Chretien with the sale of his book of business as it would for any other exclusive agent attempting to sell his or her book of business.  (Id. ¶ 65.)  While Chretien negotiated the sale of his book of business with a few potential purchasers, none of the negotiations led to any agreement on sale price or a contract to purchase Chretien's book of business.  (Id. ¶ 66.)

One exclusive agent, Sandy Beaulieu, expressed interest in buying Chretien's book of business in October 2011, but after speaking with Gredler she changed her mind.  Based on Beaulieu's affidavit, Gredler informed her that she would need to take certain steps to qualify, such as securing "6/63" licenses and hiring more staff for her agency.  (Id. ¶¶ 67-71.)  Beaulieu withdrew without ever discussing with Chretien the value of his book or a possible purchase

price.  (Id. ¶¶ 73-74.)  Another area Allstate agency, the Farnham Agency, contacted Chretien to see what he was asking.  Mark Farnham has provided an affidavit saying the agency was dissuaded when Chretien said $600,000 and that Farnham believed the value was more in the range of $350,000.  (Id. ¶¶ 77-78.)  Chretien denies Farnham's representations, but only to say that he valued his book at $900,000, and that the figure is three times his total commissions.  (Chretien Opposing Stmt. ¶ 77;  Chretien Aff. ¶ 68.)  Farnham never exchanged any financial information with Chretien, sought any information from his bank regarding a loan for the potential purchase, or sought formal approval from Allstate to be considered a purchaser for Chretien's book of business.  (Allstate's Stmt. ¶ 80.)  Allstate knew from direct communications with Beaulieu and Farnham in October that neither intended to follow through with an effort to acquire Chretien's book.  (Chretien's Add'l Stmt. ¶ 245.)

In a November 1, 2011, e-mail to Allstate, Chretien stated that he had an "independent agency already licensed and approved by Allstate to purchase the book," referring to United Insurance and its owner Christopher Condon, and sought advice as to how to proceed.  (Allstate's Stmt. ¶¶ 91, 100;  Chretien's Add'l Stmt. ¶ 243.)  Ted Roberts responded that Chretien have the agency contact Gredler and fill out an application and online questionnaire profile.  (Allstate's Stmt. ¶ 92.)  Neither Condon nor United Insurance ever filled out any application or online questionnaire in order to be approved for the purchase of Chretien's book of business.  (Id. ¶ 93.)

Although Roberts stated in his response to Chretien's November 1 email that "[w]e continue to be on the lookout for possible candidates who might be interested in your agency," in fact Allstate had learned as of November 1 that Chretien was working for another agency and intended to terminate its relationship with Chretien.  (Chretien's Add'l Stmt. ¶¶ 244-245.)

Chretien states that the decision to terminate his relationship before December 31 was motivated by the discovery that United Insurance "was now expressing serious interest in buying the agency." (Id. ¶ 251.)  Chretien states that he found three potential buyers between September 30, 2011, and December 20, 2011, a shorthand reference to the foregoing facts concerning Beaulieu, Farnham Agency, and United Insurance.  (Chretien's Stmt. ¶ 28.)  Chretien does not state that any other potential buyer ever materialized.  Chretien states that all three potential buyers "were rejected by Allstate," which is an inaccurate shorthand summation of the foregoing facts.  (Id. ¶ 30.)  Chretien asserts that he believed Roberts's November 1 representation that he was "on the lookout" for potential buyers.  Chretien told Roberts and Gredler as late as December 15 that he continued to hope to sell to an approved buyer.  (Chretien Add'l Stmt. ¶ 249.)

*Chretien's employment with United Insurance*

On September 30, 2011, Chretien accepted employment with Condon's independent insurance agency, United Insurance, to commence employment on November 1, 2011.  (Allstate's Stmt. ¶¶ 51, 98;  Chretien's Opposing Stmt. ¶ 104;  Allstate's Add'l Stmt. ¶ 7.) Chretien had been negotiating this employment as early as August 29, 2011.  (Allstate's Stmt. ¶ 97.)  Chretien also negotiated a deal in which Condon would lease 1045 Broadway and use it as a United Insurance agency location.  (Id. ¶ 101.)  As part of this deal, United Insurance hired Davis, Rollins, and Sadie, who continued to work out of the 1045 Broadway location, which maintained its "Whitehouse Agency" name.  (Id. ¶ 102;  Allstate's Add'l Stmt. ¶¶ 9-11.) Additionally, the parties to the negotiations contemplated that Chretien would return to the location once the one-year period of his Non-Competition Agreement expired, possibly in an ownership capacity.  (Allstate's Stmt. ¶ 103;  Allstate's Add'l Stmt. ¶¶ 4-6, ECF No. 151.)

Chretien states that there was a specific understanding that he would not solicit or attempt to sell insurance products for United Insurance until after December 31, 2012. (Chretien's Add'l Stmt. ¶ 163.) Chretien states that his employment with United Insurance commenced with him working as a vice president/manager from United's location in Pittsfield, Maine (more than 30 miles from the Whitehouse Agency). He also asserts that he did not begin selling insurance until January 2012. (Chretien's Stmt. ¶ 19.) Chretien's Exclusive Agency Agreement with Allstate required that he not "directly or indirectly, solicit, sell or service" others' insurance. (Chretien's Add'l Stmt. ¶ 166.) Chretien expected things to work out fine because it would take him two months to become licensed to offer or sell the lines United Insurance sold. (Id. ¶ 165.)

Allstate became aware of Chretien's new affiliation shortly after November 1 and when asked by Allstate about this affiliation, Chretien replied, "The Bangor office will be operating for customer service purposes with licensed and approved staff for the balance of the 90 day notice ending 12/31/2011." (Id. ¶ 168.) Allstate advised him that until then he could not "offer or sell products for any other carrier while still affiliated with Allstate." (Id. ¶ 169.) Chretien told Allstate that he agreed and that he was merely in training at United Insurance so that he could "be ready for work on 1/2/2012." (Id. ¶ 170.)

On November 10 and 15, 2011, Chretien corresponded with Condon and United Insurance's PR employee, Marcia Hartt, concerning forthcoming advertising for the new United Insurance location, disclosed to Condon his draft goodbye letter to his Allstate customers, and advised that advertising could not commence before January 1, 2012. (Allstate Stmt. ¶¶ 106-107; Chretien Opposing Stmt. ¶¶ 106-107.) In addition, Chretien discussed and implemented "goals, tracking and measurement" with Tyler, Davis, and Rollins and advised on quoting new business and training needs. (Allstate's Add'l Stmt. ¶ 28.) As part of the United Insurance team,

15

Chretien participated in assisting staff at the 1045 Broadway location with obtaining additional agency appointments from various insurance carriers.  (Id. ¶ 29.)  In January 2012 Chretien was copied in an email directed to 1045 Broadway employees attaching a "nonsolicitation release for our prior Allstate clients.  ☺"  (Id. ¶ 30;  ECF No. 151-17, PageID # 1964 (emoticon in original).)

*The valued customer letter*

Chretien and the staff of the 1045 Broadway location sent the following letter to the agency's Allstate customers, sometime between December 20 and December 31, 2011:

> Dear Valued Customer,
>
> After much thought and consideration our office would like to inform you that as of December 31st 2011, we will be discontinuing our relationship with Allstate. As you may have noticed, there have been several changes within the company in recent years.  In lieu of these changes and in the best interest of our present and future clients, we have decided to go in a new direction.  We are very excited about our new direction and are eager to embark on a new journey.
>
> We want to thank you for your business and your dedication to our office over the past 45 years.
>
> If you have any questions before the end of the year please give our office a call. After December 31st our office will no longer to [sic] be able to service your Allstate policies.  You may call 1-800-ALLSTATE . . . to service your current Allstate account.
>
> We wish you and your family a safe and happy holiday and best of luck in the future.
>
> Warmest Regards,
>
> Russ Chretien   Sadi Lynn Chretien Tyler   Novilla Rollins   Mackenzie Davis
>
> The Whitehouse Agency Team

(Allstate's Stmt. ¶¶ 108-109;  Chretien's Stmt. ¶¶ 10-11;  Whitehouse Agency Team Letter, ECF No. 137-13, PageID # 1440.)  Included with the letter was a United Insurance calendar with the

1045 Broadway address and a phone number for the new "United Insurance Whitehouse Agency." (PageID # 1441.) In order to disseminate the letter, Chretien instructed Sadie to use her Allstate username and password to access an Allstate database and download the customer list for the Whitehouse Agency, which included names, addresses, and telephone numbers. (Allstate's Stmt. ¶ 110.)

In the first month of operation of the United Insurance Agency at 1045 Broadway, approximately 35 former Allstate customers serviced out of this location terminated their policies with Allstate. (Allstate's Add'l Stmt. ¶ 13.) There are competing inferences that might be drawn in terms of whether this number of terminations was normal attrition or higher than normal for January. (Id. ¶ 15; Chretien's Reply Stmt. ¶ 15.)

*Was Chretien an independent contractor or an employee?*

Although Chretien and his wife invested almost one million dollars in the Whitehouse Agency, Chretien maintains that he became an employee of Allstate in 2006 when he signed the Exclusive Agency Agreement. The Agreement itself states that the exclusive agent is an independent contractor. (Chretien's Add'l Stmt. ¶ 186.) However, prior to the advent of the Exclusive Agency Agreement, all Allstate agents were Allstate employees. (Id. ¶ 185.) Chretien offers a laundry list of statements related to the ways in which Allstate exercises control over its exclusive agents. (Id. ¶¶ 187-195.) I do not reproduce the statements here because I conclude in the discussion that they are not material.

*Elaborations regarding Whitehouse Agency employees' covenants not to compete*

Once Allstate's system became entirely computerized, Allstate's approval process for a new employee would have required execution of a covenant prior to an employee receiving access to the Allstate system. (Id. ¶ 199.) The system, described in the EA Independent

Contractor Manual, known as the Agency Staff Data Tool, was an online tool established by Allstate and resident in their database for managing staff information, which included specifically "verifying completion of [the staffs'] confidentiality/non-compete agreements." (Id. ¶ 201.) The form to be executed by the employee provides that "the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed." (Id. ¶ 202.)

Chretien offers a number of additional statements about the non-competition agreements as they relate to his former employees (and former co-defendants). Allstate denies them all. Chretien's assertions are that Allstate must have had complete non-competition agreements from all of his employees because they would have been required to electronically sign them as a precondition to their use of Allstate's online resources. Allstate's admission of Chretien's Add'l Stmt. paragraph 199 creates a genuine issue here. Chretien further asserts that Allstate has not taken the non-competition agreements seriously in the past insofar as they apply to office employees and he offers a number of statements to that effect that draw on his own deposition testimony and affidavit. (Id. ¶¶ 210-222.) Additionally, Chretien asserts that Gredler, on behalf of Allstate, walked him through the process of electronically executing the agreements for his employees so Gredler could "tick" off the non-competition agreements for Chretien's three employees in 2007. According to Chretien, Gredler stated that Allstate wanted "a new one" for each employee. (Id. ¶¶ 203, 204.) Allstate's position is that Chretien agreed to obtain his employees' signatures on non-competition agreements when he executed the Exclusive Agent Agreement, but failed to do so. Allstate denies that Gredler ever walked Chretien through a process of electronically signing on behalf of the employees and says that it consistently enforces these agreements. (Allstate's Reply Statement ¶¶ 203, 211.)

DISCUSSION

Both Allstate and Chretien have filed motions for summary judgment.  The objectives of Allstate's motion are two:  (1) to eliminate Chretien's counterclaims and (2) to obtain judgment that, as a matter of law, Chretien's failure to provide Allstate with executed non-competition agreements from each of his employees was a material breach of his obligations under the Exclusive Agency Agreement.  The thrust of Chretien's motion is to obtain the dismissal of Allstate's claim that his mailing to Allstate customers amounted to unfair competition or tortious interference.  The following discussion addresses Chretien's motion first.

## A.    Russell Chretien's Motion for Summary Judgment

Chretien's motion starts with a statement that he is seeking summary judgment against Allstate's claims of breach of contract, misappropriation of trade secrets, unfair competition, and tortious interference.  (Chretien's Motion for Summary Judgment at 1, ECF No. 139.)  However, as noted in Allstate's response, this challenge goes beyond what Chretien indicated he would do at the Court's Local Rule 56(h) conference.  (Allstate's Response at 1 n.1, ECF No. 149.)  In recognition of this fact, Chretien has withdrawn his request for summary judgment on counts I and VI.[7]  (July 16, 2013 Correspondence of Counsel, ECF No. 142.)  Consequently, the only issues raised in Chretien's summary judgment motion are whether Allstate has raised a genuine issue in support of its unfair competition (count VII) and tortious interference claims (count VIII).

### 1.    *Unfair Competition*

Allstate alleges that Chretien engaged in solicitation activity in violation of the Exclusive Agency Agreement and that this activity amounts to "unfair competition."  (Am. Compl. ¶ 203.)

---

[7]    Count I is Allstate's claim that Chretien breached the Exclusive Agent Agreement by engaging in solicitation activity in competition with Allstate.  Count VI asserts misappropriation of trade secrets and confidential information through the same or similar activity.

19

Proceeding from the assumption that there is a genuine issue whether Chretien's contact with

Allstate's customers was in violation of the Exclusive Agency Agreement, and therefore might

be viewed as a breach of contract or misappropriation of trade secrets (unchallenged claims), the

question is whether there are legal and factual grounds to support the add-on claim of "unfair

competition."

Maine common law recognizes a claim of unfair competition as a species of trade fraud.

An essential element of such a claim is the intent to deceive consumers into thinking that one's

products are the products of another person or entity.  Hubbard v. Nisbet, 159 Me. 406, 407-408,

193 A.2d 850, 851 (1963);  Lapointe Mach. Tool Co. v. J. N. Lapointe Co., 115 Me. 472, 478, 99

A. 348, 350 (1916).  Allstate's evidence does not include the kind of factual presentation that

would warrant a claim of unfair competition.  Allstate advocates for a broader, "fair play" cause

of action, asserting that a finder of fact might conclude that Chretien "did not comport with any

notions of fair play."  (Allstate's Response at 6.)  However, Maine common law does not support

maintenance of an independent "fair play" cause of action and certainly federal court is the

wrong place to come if Allstate seeks to advocate for the development of new Maine law.

Moreover, Allstate's attempt to use an unfair competition theory to, in effect, impose a common

law duty not to compete is in tension with public policy.  Cf. Chapman & Drake v. Harrington,

545 A.2d 645, 647 (Me. 1988) (observing that covenants not to compete are generally

disfavored).

### 2. *Tortious Interference*

Tortious interference with a prospective economic advantage requires a plaintiff to prove:

(1) the existence of a valid contract or prospective economic advantage; (2) interference by the

defendant with the contract or advantage by means of fraud or intimidation; and (3) resulting

damages.  Currie v. Indus. Sec., Inc., 915 A.2d 400, 408 (Me. 2007).  Chretien requests the dismissal of Allstate's tortious interference claim because Allstate did not include in its complaint any allegations of either fraud or intimidation and because Allstate's evidence does not disclose fraud or intimidation.  (Chretien's Motion at 10.)  Should the Court find otherwise, Chretien argues that the claim cannot go forward because Allstate has not raised a genuine issue whether it suffered any damages as a consequence of either fraud or intimidation.  (Id. at 11.)

Allstate argues that it has generated a genuine issue because the evidence is capable of supporting a finding of interference through fraud.  According to Allstate, Chretien's letter to his former Allstate customers contained "confusing and misleading information."  That information was in the following sentence:  "There have been several changes within the company in recent years.  In lieu of these changes, and in the best interest of our present and future clients, we have decided to go in a new direction."  (Allstate's Response at 14.)  Allstate says this language was confusing and would have caused its insureds to believe that their policies with Allstate were being terminated.  (Id.)  Allstate also says there is a genuine issue concerning interference by intimidation.  According to it, its claim is actionable so long as it can show "that Chretien made clear to Allstate customers that the only way they could continue to use Chretien and his team as their insurance provider was to terminate their contract with Allstate and purchase insurance products from United Insurance."  (Id. at 15-16.)  Also, Allstate complains that the language in the letter "implies that if the Allstate customer does not terminate his or her Allstate agreement and join Chretien, they will somehow be harmed."  (Id. at 16.)  Finally, Allstate suggests that permitting United Insurance to lease the 1045 Broadway location was an act of intimidation because any Allstate customer who should visit that location would "inevitably be subject to a United Insurance pitch and pressured to switch insurance providers."  (Id.)

Chretien is correct that Allstate's complaint fails to state a claim of tortious interference. Nowhere in Allstate's complaint can the words "false," "fraud," or "intimidate" be found, let alone factual allegations designed to articulate these essential elements of the claim. Chretien's request for dismissal on that ground has merit. Additionally, for reasons that follow, Allstate has failed to adequately develop this count for purposes of trial.

        *a.*     *Interference by fraud*

To demonstrate interference by fraud, the plaintiff must show (1) a false representation (2) of material fact, (3) made with knowledge of the falsity or with reckless disregard, (4) for the purpose of inducing another to act, where (5) the other person in fact justifiably relies on the representation to the plaintiff's harm. <u>Sherbert v. Remmel</u>, 908 A.2d 622, 623 n.3 (Me. 2006).

Allstate's lead argument for a finding of fraud is unpersuasive. Although it might border on plausible that a reader of the letter could get the idea that his or her policy with Allstate was being terminated, reliance on such a notion would not be justifiable. There is no evidence that would support a finding that any customer canceled an Allstate policy because he or she understood that the Whitehouse Agency was terminating the policy. The proposition does not even make sense.

Of the various other alternative "frauds" advanced by Allstate, the one colorable instance of a material false representation is the possible inference a reader of the letter might draw that there are unfavorable things happening within Allstate that make it disadvantageous to remain an Allstate customer. This message would at least induce people to call and inquire. Nevertheless, even if this one sentence in the letter is sufficient to justify an Allstate-favorable finding on the false representation element of the interference tort, Allstate still must demonstrate that at least one recipient of the letter actually relied on the statement and canceled his or her insurance

contract with Allstate for that reason.  Ultimately, there simply is no evidence of reliance in the summary judgment record.  Instead, Allstate depends entirely on evidence that there were 35 terminations in January 2012.  This evidence is capable of supporting an inference that the rate of attrition was uncommonly high for the month of January.  But Allstate has not developed the record to raise a genuine issue whether any of the 35 customers actually canceled a contract because of reliance on a false representation rather than for some other, equally likely reason.[8]

> b.    *Interference by intimidation*

Intimidation can be demonstrated not only with a showing of conduct designed to frighten a person for coercive purposes, but also with conduct designed to procure a breach of contract by making it clear to another that the only manner in which the other could obtain the benefit of working with the defendant would be to break off a relationship with the plaintiff. Currie, 915 A.2d at 408.

The facts relied on by Allstate do not include any act of intimidation.  The letter contains nothing whatsoever that is threatening.  Nor does it suggest that the customer must choose any course in particular.  If customers in fact thought that "the only way they could continue to use Chretien and his team as their insurance provider was to terminate their contract with Allstate and purchase insurance products from United Insurance" (Allstate's Response at 15-16), it would not be because of intimidation, but the ordinary result of the Whitehouse Agency and Allstate parting ways and the fact that many persons elect to obtain all of their insurance products through one local agency.  Additionally, this claim suffers from the same absence of evidence sufficient to support a non-speculative inference that a loss of customers was actually caused by interference in the form of either fraud or intimidation rather than some other cause.  The mere

---

[8]    For example, loyalty to Chretien and his three employees could just as easily explain higher than usual cancelations.  Insurance agents commonly have family and friends as customers.

loss of customers does not warrant an inference that they were lured away by fraud or scared away by intimidation.

### 3.   Summation

For the reasons set out above, Chretien is entitled to summary judgment in his favor on Allstate's claims of unfair competition (count VII) and tortious interference (count VIII). Because Chretien's has withdrawn the balance of his motion for summary judgment, his motion should otherwise be denied.

## B.   Allstate's Motion for Summary Judgment

Allstate requests summary judgment in its favor on one of its own breach of contract theories.  Allstate wants the court to find that, as a matter of law, Chretien's failure to deliver to Allstate Confidentiality and Non-Competition Agreements executed by each one of his employees was a material breach of the Exclusive Agency Agreement.  (Allstate's Motion at 7-9, ECF No. 135.)  Otherwise, Allstate seeks summary judgment against five of Chretien's six counterclaims (all but his first count for breach of contract for non-payment of the TPP or the loss of his ability to sell his economic interest in his Allstate book of business).  The five challenged counterclaims are as follows: tortious interference (count II), unfair competition (count III), conversion (count IV), fraud (count V), and whistleblower retaliation (count VI). The discussion addresses each of these counterclaims in turn and then takes up the issue of Allstate's request for summary judgment in its favor on one of its contract claims.

### 1.   Tortious Interference (counterclaim count II)

This claim is based on three different sets of allegations.  First, Chretien alleges that Allstate practiced a fraud on Chretien by promising to assist him with the sale of his book of business but never intending to do so, refusing to approve two qualified buyers, and intimidated

potential buyers to prevent them from buying Chretien's book.  (Counterclaim Count II, ¶¶ 19-20, ECF No. 104.)  Second, Chretien alleges that Allstate tortiously interfered with his relationship with certain of his clients when it exercised its plan to cancel the Deluxe Plus policies.  (Id. ¶¶ 21-25.)  Third, Chretien alleges that Allstate interfered with his efforts to purchase the books of other agencies through intimidation.  (Id. ¶ 28.)  Chretien presses all of these claims in his response to Allstate's summary judgment motion.  I address the claims in chronological order, but first repeat the essential elements of the tort:  (1) the existence of a valid contract or prospective economic advantage; (2) interference by the defendant with the contract or advantage by means of fraud or intimidation; and (3) resulting damages.  Currie, 915 A.2d at 408.

        *a.*     *Deluxe Plus cancelations*

Allstate argues that its Deluxe Plus cancelations were a matter entirely within its discretion under the express terms of the Exclusive Agency Agreement so that its cancelations cannot be treated as "interference" as a matter of law.  (Allstate's Motion at 17.)  Additionally, Allstate states that there is no evidence of an illegal motive or "improper motivation" targeted at Chretien's book of business.  (Id. at 18.)  Chretien responds that Allstate was bound by a duty of good faith and fair dealing not to discontinue products or interfere with the work of its agents and, therefore, did not have unbridled discretion to cancel the Deluxe Plus policies.  Chretien also takes issue with the idea that a tortious interference claim requires proof of the alleged tortfeasor's intent to harm the person bringing suit.  (Chretien's Response at 16-17, ECF No. 146.)

Chretien's presentation in support of this claim lacks a showing of interference through fraud or intimidation, let alone justifiable reliance, coercion, or undue influence.  The evidence

merely shows that Allstate canceled certain policies and, to some extent, failed in achieving that end because its "Class 10" rationale was in some cases deemed unjustified by the Maine Department of Insurance.  Additionally, the relationship in question was Allstate's own contractual relationship with its insured.  It was free to attempt to cancel that relationship or the existing terms of that relationship, even if Chretien obtains a commission for servicing the relationship.  Chretien agreed under the Exclusive Agency Agreement that Allstate would be free to decide what insurance products it wished to provide or discontinue.

> b.    *Chretien's attempts to purchase other books of business*

Chretien argues that he has raised a genuine issue concerning the use of fraud or intimidation to prevent him from purchasing the books of business developed by other agencies. Allstate once more leads with its "absolute right to approve or disapprove any purchaser," but then says that it chose to deny Chretien the opportunity because he was not meeting his expected results.  Finally, Allstate observes that the record does not contain evidence of interference with any deal through fraud or intimidation.  (Allstate's Motion at 15-16.)  Chretien responds that "refusal to deal" or "ulterior motives" can substitute for fraud or intimidation and he points to evidence capable of supporting a finding that Gredler told Chretien that Allstate was angry with Chretien's involvement in challenging its Deluxe Plus cancelation / Class 10 program and therefore would not approve him for any purchase.  (Chretien's Response at 15.)

Even if the jury were to find that Allstate shut Chretien out of any prospective advantage in acquiring another agency's book of business because it was angry with Chretien, that finding would not establish the existence of either fraud or intimidation.  There is no genuine issue of fraud because there is no evidence of any misrepresentation of fact being communicated to a selling agency.  Similarly, there is no genuine issue of intimidation because there is no evidence

of any communication that imposed undue pressure on a selling agency or threatened not to deal with any selling agency.

As for Chretien's more ambitious argument that the common law of tortious interference should protect against "refusals to deal" or "ulterior motives," it cannot be sustained by existing Maine tort law.  Nothing in Maine tort law required Allstate to provide Chretien with an opportunity to purchase a book of business that someone else developed for Allstate.

> c. *Chretien's attempt to sell his book of business*

Finally, Chretien asserts that Allstate tortiously interfered with his efforts to sell his book of business to other interested parties.  Allstate's challenge to this claim is once more based, in part, on the fact that the Exclusive Agency Agreement expressly states that Allstate may approve or disapprove potential buyers for any reason.  (Allstate's Motion at 10-11.)  Additionally, Allstate argues that the evidence concerning the three alleged purchasers does not support a finding that any of them seriously pursued the possibility of purchasing Chretien's book.  (Id. at 11-13.)  Finally, Allstate claims that the record shows it did provide some assistance to Chretien, even though it did not need to, and that, in any event, there is no evidence of either fraud or intimidation.  (Id. at 14-15.)  In addition to some of the arguments already addressed, Chretien says that Allstate dissuaded or disapproved his buyers before they could discuss terms.  (Chretien's Response at 13-14.)

There is no genuine issue of actionable interference.  As for interference through fraud, there is no evidence that Allstate made any false representations to any potential purchasers.  As for interference through intimidation, certainly Allstate is in a position to intimidate its own agents should it choose to do so.  However, Chretien has not developed his case with any actual evidence of intimidation or comparable conduct directed at any of the potential buyers.  The

evidence indicates that the Farnham Agency was unwilling to pay what Chretien was asking and that Beaulieu lost interest when she learned that she would need to obtain additional licensing and hire additional staff for her agency.  Chretien does not offer any evidence suggesting that it would be unreasonable to expect Beaulieu to take these steps if she wanted to acquire Chretien's substantial book of business.  The final prospect was Condon.  There is no evidence of any fraudulent or intimidating communication from Allstate to Condon.  Even under Chretien's inaccurate tort theory that Allstate was required "to deal" with all prospects, his effort to support such a claim based on Condon's mere inquiry about a purchase (which was not pursued by Condon and which coincided with information that Chretien was now Condon's employee) is difficult to comprehend.  Once more, it cannot seriously be maintained that the common law of torts required Allstate to give its blessing to any transfer of its clients' accounts or to deal favorably with Chretien.

### 2.      Unfair Competition (counterclaim count III)

Chretien's claim of unfair competition is based on Allstate's support and promotion of Esurance.  (Counterclaim Count III, ¶ 33.)  Chretien concedes that he cannot sustain this cause. (Chretien's Response at 18.)

### 3.      Conversion (counterclaim count IV)

Chretien contends that Allstate converted his interest in selling his book of business by exercising dominion and control over it.  (Counterclaim Count IV, ¶¶ 35-38.)  "The gist of conversion is the invasion of a party's possession or right to possession."  Chiappetta v. LeBlond, 505 A.2d 783, 785 (Me. 1986).  The claim has three required elements:  (1) that the person claiming conversion had a property interest in the subject property; (2) that the person had a right to possession at the time of the alleged conversion; and (3) that the person made a

demand for a return, which was refused by the holder.  <u>Moore v. Me. Indus. Servs.</u>, 645 A.2d

626, 629 (Me. 1994).

      Allstate assumes that this claim is based on its seeding of the Whitehouse Agency's

customer accounts 90 days after the termination of Chretien's Exclusive Agency Agreement.

(Allstate's Motion at 19.)  It argues that the claim is not viable because, when the seeding of

accounts occurred Chretien no longer had an interest in the accounts that could be converted.

(<u>Id.</u> at 19-20.)  Chretien responds that Allstate converted his interest in selling his book when

Allstate shut down the Whitehouse Agency on December 20, 2011, taking away his access to the

data he would need to market his interest.  He also contends that Allstate agreed to give him until

April 1, 2012, to sell his book.  (Chretien's Response at 17.)  Allstate says in reply that the

deadline for a sale was December 31, 2011, and that closing the agency on December 20 did not

prevent Chretien from selling his interest.  (Allstate's Reply at 12-13, ECF No. 161.)  Allstate

does not challenge Chretien's ability to prove demand and refusal.

      It is tempting to suggest that Chretien's conversion claim simply be treated as a corollary

to his contract claim and that it go forward as a complement to that claim.  Chretien's economic

interest in the book of business he developed and maintained is a kind of intangible personal

property over which Allstate, pursuant to the Exclusive Agency Agreement, exercised dominion

and control.  In the abstract, Chretien's "book" sounds like something that might be possessed—

at least to the exclusion of other agents—and Allstate recognizes that its Exclusive Agency

Agreement gives agents a period of time in which to attempt a sale.  By not challenging

Chretien's contract claim Allstate has, arguably, set up a conversion claim.  On the other hand,

most breach of contract claims do not give rise to a claim of conversion.  Chretien's conversion

theory warrants further discussion.

In actual fact, Chretien complains about Allstate's exercise of control over access to Allstate's own confidential data and Allstate's failure to support or facilitate sale of his economic interest in an Allstate asset, an asset made negotiable pursuant to the Exclusive Agency Agreement, subject to Allstate approval.  As for the access to data, Chretien's claim concerns Allstate's removal or disconnection of the phones and computers at the Whitehouse Agency on December 20, 2011.  Chretien says that he was wrongfully deprived of his right to access the data he would have used to market his interest, and being so deprived effectively lost his interest. This is not a valid claim of conversion.  Chretien had a qualified contractual right to access the data, not a right to possess it over Allstate's objection.  Chretien fails to establish a right to possess Allstate's data over Allstate's objection and, by extension, fails to raise a genuine issue of conversion related to data access.  That leaves Allstate's decision to seed the accounts that make up Chretien's book of business to other area agencies starting in January 2012.  Whether the seeding of the accounts took place after the expiration of the 90-day period or within some theoretical extension of the period, Chretien's contractual "right" to sell an economic interest in the book of business was subject to specific contractual conditions, not on any right to actual possession of the accounts that make up the book.  These facts support, at most, a contract claim.  Because a claim for conversion of a possessory interest in personal property is not demonstrated on this record, I recommend that the Court dismiss this count.

### 4. Fraud (counterclaim count V)

The claim of fraud is premised on the communication between Chretien and Ted Roberts in which Roberts "promised" Chretien that Allstate would assist in the sale of his economic interest and would be on the lookout for a buyer.  (Counterclaim Count V, ¶ 40.)  Allstate says that there is no evidence of a false representation because it did "contact" and "reach out to"

potential purchasers and because it was Chretien's responsibility to get his agency listed on

Allstate's website.  (Allstate's Motion at 21.)  Allstate also asserts that promising to help

someone and failing to do so is not fraud but, at most, a breach of contract.  (Id. at 22.)  Finally,

Allstate asserts that the claim cannot go forward because Chretien has no evidence of damages,

not being able to point to a potential purchaser who would have purchased his book if only it had

been listed on Allstate's website.  (Id.)  Chretien's response begins as follows:

> A jury could conclude that Allstate committed fraud by both direct
> misrepresentation and by "active concealment" that Allstate was not advertising
> his book of business, that it was not helping to find buyers for Russ, that it knew
> that prospective buyers it was supposed to be vetting had backed out or been
> dissuaded, that it was going to make the TPP Russ's only option and that he was
> being involuntarily terminated when Allstate knew there was no cause to
> terminate him.

(Chretien's Response at 9-10.)  But in particular, Chretien focuses on Roberts's statement on

November 4, 2011, that "we continue to be on the lookout for possible candidates who might be

interested in your agency."  (Id. at 10.)  Chretien complains that, in fact, Roberts had no such

intention and was even then planning to terminate the agency relationship.  (Id.)  Chretien says

he believed the representation, but is not very clear about how he relied to his detriment except to

complain that no sale materialized.  (Id. at 11.)  What he says concerning damages is that he

suffered a "lost opportunity" to sell, citing Snow v. Villacci, 754 A.2d 360, 364-65 (Me. 2000)

(recognized claims for lost earning opportunities but requiring "careful attention to the quality of

the evidence" and requiring proof of a "real" opportunity and "not merely a hoped-for

prospect"), and that he is in a position to testify concerning the $900,000 value of his book of

business.  (Id. at 12-13.)

Common law fraud consists of (1) a false representation (2) of a material fact (3) made

with the knowledge it was false or in reckless disregard of whether it was false (4) for the

purpose of causing another party to rely on the false representation, if (5) the other party

justifiably relied upon the representation as true to his or her injury.  Barr v. Dyke, 49 A.3d 1280,

1286-87 (D. Me. 2012).  Fraud can also involve concealment of the truth, but in such cases there

must be a legal or equitable duty to disclose the truth.  Id. at 1287.

     Maine common law is nuanced when it comes to the question of whether a promise to

undertake some future action, even with the present intention not to do so, will support a claim of

fraud rather than a claim of breach of contract.  Compare Boivin v. Jones & Vining, Inc., 578

A.2d 187, 188-89 (Me. 1990) (holding in the context of an employment relationship that the

promise of indefinite employment without the authority to fulfill the promise supported a jury

verdict finding fraud) with Shine v. Dodge, 130 Me. 440, 43 (1931) ("[T]he breach of a promise

to do something in the future will not support an action of deceit, even though there may have

been a preconceived intention not to perform.").[9]  But however nuanced the law of fraud may be

when it comes to promises of future performance, it is not designed to do more than fulfill the

promise in question.  In Boivin, for example, the judgment was to award the severed employee

the economic value of his promised employment; in effect, the promise was fulfilled.  Here,

Chretien is attempting to use a fraud claim to rewrite the Exclusive Agency Agreement to require

Allstate to pay market value rather than the TPP if he can show that Allstate failed to make a

good faith effort to shoulder the burden of finding him a buyer, a burden it never assumed under

the Exclusive Agency Agreement.

     Roberts's alleged promise to be "on the lookout" does not bear that weight.  The best

legal expression of that point is to find that the alleged misrepresentation was not "material."

Alternatively, the court could just as readily find that Chretien's presentation fails to demonstrate

---

[9]     The First Circuit Court of Appeals has perhaps spilled the most ink on this issue of Maine law, at least recently.  See Kearney v. J.P. King Auction Co., 265 F.3d 27, 33-38 (1st Cir. 2001) (collecting both Maine Supreme Judicial Court and First Circuit cases addressing the issue).

justifiable reliance.  If Chretien relied by reducing his own efforts to find a purchaser, such reliance was unjustified.  Nothing in Roberts's statement would have suggested to any reasonable business person that he or she should reduce his or her personal efforts to locate a purchaser.  Moreover, Chretien could readily ascertain whether Allstate had listed his property. There is no evidence that the listing service was restricted so that Chretien could not access it.  If Chretien's position is that he relied by drawing the conclusion that Allstate was assuming a contractual obligation to market his business or otherwise seek a potential buyer, such reliance was equally unjustified.  Roberts merely stated he would be on the lookout.  In fact, Chretien's position was no different after the representation than it was before the representation; he was left with a hope that Allstate might locate a buyer for him.  That simply is not detrimental reliance.

### 5. Whistleblower Retaliation (counterclaim count VI).

Chretien alleges that he is the victim of whistleblower retaliation based on Allstate's animus toward his opposition to the Deluxe Plus / Class 10 program.  The whistleblower activity, as alleged, is that he "reported to the Maine Insurance Commission activities of Allstate which [he] believed violated Maine law or regulations in regard to the marketing and termination of homeowners' insurance."  (Counterclaim Count VI, ¶ 45.)  The retaliatory act he complains of in his counterclaim is the following "example":  "Allstate refused to let him sell his economic interest, and took the unprecedented step of suing him under the Agreement."  (Id. ¶ 47.)

Pursuant to the Maine Whistleblowers' Protection Act (WPA):

No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

A.  The employee, acting in good faith . . . reports orally or in writing to the

> employer or a public body what the employee has reasonable cause to believe is a
> violation of a law or rule adopted under the laws of this State . . . .

26 M.R.S. § 833(1)(A).  The WPA "provides a right of action to persons who have been subject

to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or

other adverse employment actions."  Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051,

1053 (Me. 2008) (citing 5 M.R.S. §§ 4572(1)(A), 4621 as well as 26 M.R.S. § 833).

Allstate's challenge to the whistleblower claim is in three parts.  First, Allstate argues that

Chretien was not an employee and therefore was not protected by the WPA.  (Allstate's Motion

at 23-24.)  Second, Allstate says Chretien cannot establish that he suffered an adverse

employment action.  (Id. at 25-26.)  Third, Allstate says Chretien cannot establish causation.  (Id.

at 26-27.)

### a. "Employee" status

To fall under the Act's protection, Chretien must demonstrate that he was Allstate's

employee.  The Act supplies the following definition for the term "employee":

> "Employee" means a person who performs a service for wages or other
> remuneration under a contract of hire, written or oral, expressed or implied, but
> does not include an independent contractor engaged in lobster fishing.
> "Employee" includes school personnel and a person employed by the State or a
> political subdivision of the State.

26 M.R.S. § 832(1).

Neither party cites a case—and to my knowledge there is no opinion or decision from the

Maine Supreme Judicial Court, the Maine Superior Court, the First Circuit, or this Court—that

construes this definition in the context of whether an independent contractor performs a service

"under a contract of hire."  Nor has the Maine Human Rights Commission addressed the

question in its regulations.[10]   However, when the language is interpreted in accordance with its plain meaning, the first step in statutory construction, see Fuhrmann v. Staples the Office Superstore E., Inc., 58 A.3d 1083, 1093 (Me. 2012), it is clearly drawn in broad enough terms to extend its protection to an independent contractor.  Independent contractors are, in fact, hired pursuant to contract and they are paid remuneration for their services.  Consequently, they fall within the definition.  Moreover, by excepting from the definition only those independent contractors "engaged in lobster fishing," the Legislature implicitly recognized that independent contractors come within the Act's definition of employee.[11]

       *b.*     *Adverse action and causation*

Allstate says there is no evidence of an adverse employment action, asserting that it did not refuse to allow Chretien to sell his book and that its decision to pursue legal action to enforce its Confidentiality and Non-Competition Agreement was not an employment action.  Allstate also asserts that Chretien has acknowledged that his terms and conditions of employment were not negatively impacted following the Deluxe Plus / Class 10 controversy.  (Allstate's Motion at 25-26.)  Chretien responds that he was denied "economic opportunities" and that the denial is sufficient to support a finding of adverse action.  (Chretien's Response at 18.)

Because Chretien does not attempt to support his assertion that Allstate's enforcement action is a form of adverse *employment* action or that it arose because of his engagement in protected activity, I treat that allegation as waived.[12]  Consequently, the only adverse action(s) in

---

[10]     Chretien attaches to his response to the motion a copy of a Human Rights Commission memorandum indicating that it is "unclear" whether the WPA covers independent contractors.  (Chretien's Response at 19; Chretien's Exhibit 45, Apr. 26, 2006, Memorandum of John Gause, Commission Counsel, ECF No. 146-1.)

[11]     Allstate asks the Court to consider the whistleblower law of other states, but the Maine WPA has its own specific definition of "employee" and in light of its plain meaning there is no occasion to look to other courts for guidance.

[12]     In any event, it is plain that the enforcement action was motivated by intervening events and not by Chretien's resistance to the Deluxe Plus cancelation program.  Moreover, Chretien was no longer an "employee" when Allstate filed this action on January 31, 2012.

question concern the alleged denial of economic opportunities to purchase other agencies' books or to sell his own.  With respect to these alleged adverse actions, Allstate replies that they are not supported by the evidence.  (Allstate's Reply at 14.)

"Actions adverse to employment are recognized as those that 'adversely affect the employee's compensation, terms or other conditions of employment.'" LePage v. Bath Iron Works Corp., 909 A.2d 629, 636 (Me. 2006) (quoting DiCentes v. Michaud, 1998 ME 227, ¶ 21, 719 A.2d 509, 516 (Me. 1998) (addressing whistleblower claim)).

> An employee has suffered an adverse employment action when the employee has been deprived either of "something of consequence" as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld "an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service."

Id. (quoting Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996) (addressing retaliation claim)).[13]

Viewed in the light most favorable to Chretien, the record includes evidence that Matt Gredler told Chretien he was being denied the opportunity to acquire additional books of business because of displeasure with his opposition to the Deluxe Plus / Class 10 cancelation program.  If the finder of fact concludes that whistleblower retaliation was in fact the reason for Allstate's denial of this accouterment of the Exclusive Agency Agreement relationship, then relief pursuant to the WPA is available to Chretien.

### 6.    *Allstate's Request for a Judgment Finding Breach as a Matter of Law*

The final issue raised in Allstate's motion is whether or not the summary judgment record compels a finding that Chretien breached the Exclusive Agency Agreement by failing to provide

---

[13]      The Maine Whistleblowers' Protection Act, which was at issue in LePage, does not include the "any other matter directly or indirectly related to employment" clause that is found in the Maine Human Rights Act.  However, Maine Supreme Judicial Court decisions do not suggest that the standard for judging adverse employment actions is higher for whistleblower claims than for other discrimination claims.

Allstate with a confidentiality and non-competition agreement signed by each of his employees. Allstate asserts that the undisputed evidence establishes that Chretien executed the agreements himself on behalf of his employees. (Allstate's Motion at 8.) Allstate says because the employees did not personally execute the agreement, Allstate is unable to enforce the terms of the agreement against the employees and has had to accept that they may compete with Allstate from the same location and that it cannot pursue claims against them for sharing confidential information with United Insurance. (Id. at 8-9.) Chretien responds that Allstate is simply attempting to get a court ruling that will justify its argument that it need not pay Chretien the TPP because his failure to abide by conditions in the Exclusive Agency Agreement results in a forfeiture of his right to the TPP. Chretien otherwise says that the existence of a breach and its materiality are fact-intensive issues not amenable to summary judgment. (Chretien's Response at 3-4.)

The record generates a genuine issue whether Allstate's assertion is true that the only confidentiality and non-competition agreements it ever received for the employees were the ones that Chretien electronically signed. The record indicates that there is a basis for the finder of fact to conclude that Allstate's electronic systems call for users to electronically sign an electronic version of the Confidentiality and Non-Competition Agreement. The record also supports an inference that Chretien's employees accessed the system before Chretien was asked by Gredler in 2007 to go through the process to "tick" off an agreement for each employee. In fact, Allstate has admitted that its "approval process for a new employee would have required execution of a covenant prior to an employee receiving access to the Allstate system." (Chretien's Add'l Stmt. ¶ 199; Allstate's Reply Stmt. ¶ 199.) If the finding is that the employees more likely than not electronically signed the agreement, then the materiality of the asserted breach is called into

question.  On this record, the materiality of Chretien's breach is a question of fact.  <u>Jenkins, Inc.</u>

<u>v. Walsh Bros.</u>, 776 A.2d 1229, 1234 (Me. 2001) ("Whether a material breach has occurred is a

question of fact.")[14]  This request for summary judgment should be denied.

CONCLUSION

Based on the summary judgment factual record generated by the parties and for the

reasons set forth above, I recommend that the Court:

GRANT Chretien's Motion for Summary Judgment (ECF No. 139), and DISMISS

Counts VII and VIII of Allstate's Amended Complaint; and

GRANT IN PART Allstate's Motion for Summary Judgment (ECF No. 135), and

DISMISS Counts II, III, IV, and V of Chretien's Counterclaim.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
November 5, 2013                                             U.S. Magistrate Judge

---

[14]     Waiver is among Chretien's affirmative defenses.  (Answer and Counterclaim at 27, Defenses ¶ 9.) The summary judgment record may also support a waiver defense, which would be consistent with Chretien's materiality argument.  <u>Interstate Indus. Uniform Rental Service, Inc. v. Couri Pontiac, Inc.</u>, 355 A.2d 913, 919 (Me. 1976) ("[I]f one in knowing possession of a right does something inconsistent with the right or of his intention to rely upon it, he is deemed to have waived that right and is estopped from asserting that right if renunciation of the waiver would prejudice the party who has relied upon it.").